**Beverly Jean NEWTON, as legal representative of the Estate of Michael Patrick Donnelly, deceased, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 88–67V.

United States Claims Court.

Nov. 15, 1989.

Anthony M. Colantoni, Chicago, Ill., for petitioner.

The attorney of record for respondent withdrew his appearance prior to the hearing before the Special Master.

## ORDER FOR ENTRY OF JUDGMENT

### NETTESHEIM, Judge.

Under the National Childhood Vaccine Compensation Program, 42 U.S.C. §§ 300aa–1—300aa–33 (Supp.V 1987), this matter comes before the court on the basis of the Report and Recommendation filed on October 23, 1989, by Special Master David A. Gerard.

---

\* Since no additional material was filed after the Special Master's Report and Recommendation, *see Newton v. Secretary,* 18 Cl.Ct. 665, 665 n. 1 (Cl.Ct.Sp.Mas.1989), public access to this filing is not barred.

1. This report may contain information that may not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12(c)(2) (Supp. V 1987). Accordingly, within fourteen (14) days after the date of this report, the parties shall designate any material

Neither party has filed any objection to the Special Master's findings or conclusions of law, and the time to so file has expired.

■■■ The Special Master's Report and Recommendation, including his recommended findings and conclusions of law, is adopted by the court pursuant to 42 U.S.C. § 300aa–12(d)(2) and attached hereto as if fully reproduced in this order.

Based on the foregoing,

IT IS ORDERED, as follows:

The Clerk of the Court shall enter judgment for petitioner in the amount of $265,-790.53, representing $250,000.00 for the statutory award to petitioner and $15,-790.53 for attorney's fees and costs.\*

No additional costs.

## APPENDIX

In the United States Claims Court

(No. 88–67V)

(Filed: October 23, 1989)

Anthony M. Colantoni, Chicago, Ill., appeared for petitioner.

Charles R. Gross, with whom were Asst. Atty. Gens. John R. Bolton and John Lodge Euler, initially appeared for the respondent, but withdrew their appearances prior to the hearing scheduled in this case.

## REPORT AND RECOMMENDATION [1]

### GERARD, Special Master.

On behalf of her deceased son, Michael Patrick Donnelly [hereafter "Michael"], petitioner filed this application for compensation under the National Childhood Vaccine Injury Act of 1986 [2] [hereafter "Act"]. Petitioner claims that as a direct result of the

---

subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

2. Pub.L. No. 99–660, enacted November 14, 1986, amended by Pub.L. No. 100–203 (1987) and Pub.L. No. 100–360 (1988) (codified at 42 U.S.C. §§ 300aa–1 to 300aa–34 (Supp. V 1987)).

administration of a DPT[3] vaccination, Michael suffered a shock-collapse or hypotonic-hyporesponsive collapse [hereafter "HHC"], and an encephalopathy, causing his death. On behalf of his estate, petitioner seeks an award of $250,000, including $12,703 as reasonable attorneys' fees and $4,815.53 for costs incurred.

Pursuant to § 300aa–12(c)(2) and Vaccine Rule 18, and based upon all the credible evidence in the record, the undersigned recommends that the court award petitioner compensation in the amount of $250,000. Based upon the statements submitted by petitioner's counsel, the undersigned recommends that the court's judgment include the sum of $12,703 for reasonable attorneys' fees and $4,815.53 as reimbursement for the costs incurred in the prosecution of this petition. Judgment should be rendered for petitioner in the amount of $267,-518.53.

## BACKGROUND

On November 30, 1988, petitioner filed her petition for compensation under the Act. Charles R. Gross, an attorney with the United States Department of Justice, filed an appearance on behalf of the respondent, the Secretary of Health and Human Services [hereafter "Secretary"]. After the Secretary answered, petitioner filed her reply. The Secretary's counsel participated in three status conferences but formally withdrew his appearance on May 26, 1989. The Secretary was ordered to complete his medical evaluation of this case and submit his report by April 10, 1989. However, he failed to do so until October 20, 1989[4], over one month after the hearing. The Secretary admitted that Michael suffered an encephalopathy and a seizure within three days after the administration

of the DPT vaccine, as provided in § 300aa–14. In effect, petitioner's entitlement to compensation under the Act was conceded. However, the Secretary's letter did not provide any specific information about what facts or medical opinion that he relied upon in reaching his conclusion. Although the Secretary's letter did not comport with the procedural requirements of Vaccine Rules 5(e) and 81, in the interests of justice, the undersigned accepted it into the record. Therefore, this recommendation is based upon the evidence submitted by petitioner at the hearing as well as the Secretary's subsequent ratification of such evidence.

The hearing was held on September 14, 1989 in Washington, D.C. Beverly Jean Newton and Mark Robin Geier, M.D. appeared as witnesses in support of the petition. Eight exhibits were admitted into evidence.

## ISSUES

There are two issues presented: first, whether petitioner has demonstrated by a preponderance of the evidence that Michael's injuries and resultant death were caused by the DPT vaccine; and second, does a preponderance of evidence establish that his injuries or death were caused by some unrelated agent or condition.

## FINDINGS OF FACT

The following uncontroverted facts are supported by the record and adopted by the undersigned.

Michael was born on October 7, 1971, the first child of the petitioner, Beverly Jean Newton, and Michael James Donnelly. He was born after a normal pregnancy and delivery, weighed 10 pounds, 14½ ounces and measured 21½ inches in length. His Apgar tests[5] resulted in scores of 9 and 10,

---

**3.** Diphtheria and tetanus toxoids with pertussis vaccine.

**4.** *See* letter, dated Oct. 12, 1989 to the undersigned from Barbara Hudson, an attorney with the Secretary's General Counsel, which was postmarked on Oct. 16, 1989 and received and filed on Oct. 20, 1989 [hereafter "Secretary's letter"].

**5.** An Apgar test measures heart rate, respiration, muscle tone, responsiveness to stimulation, and skin color. Generally two tests are conducted at exactly one minute and five minutes after birth. A perfect score is ten. *The Merck Manual of Diagnosis and Therapy* at 986 (13th ed. 1977) [hereafter *"Merck* at ___"].

respectively. Michael's overall condition at birth was described as normal and healthy.[6]

Thereafter, Michael was examined by Dr. Ramon Buenaver, his pediatrician, on two occasions and found him to be a normal, healthy child.[7] From · birth until two months of age, Michael was a very healthy baby, who ate and slept on a regular schedule. He thrived, gained weight, grew stronger and had a good appetite.[8]

On December 1, 1971, when he was two months old, Dr. Buenaver administered a DPT vaccination to Michael in Tempe, Arizona.[9] On December 2, 1971 at 3:30 p.m., Michael began to cry persistently and inconsolably. Later that night, his crying intensified into high-pitched screaming. He was irritable all night, and his mother was unable to comfort him. On at least ten occasions, he arched his back, became stiff, extended his arms and legs, and trembled. Michael finally fell asleep around 4:00 a.m. the next morning.[10]

On December 3, 1971 at approximately 10:00 a.m., Michael was found lying in bed, listless, limp, unresponsive, very pale and ashen, with a 105° fever.[11] When he was admitted at Mesa Lutheran Hospital, he became cyanotic and unresponsive, his fever elevated to 106° and he suffered a convulsion. He was diagnosed to be in severe shock.[12] Later that afternoon, Michael was transferred to Good Samaritan Hospital and treated for shock and kidney failure. Dr. Alan Yodell, a neurologist, found Michael to be comatose, unresponsive, edematous, in a state of cardiovascular collapse, and having a full and somewhat tense fontanelle. His diagnosis was that Michael suffered from severe, irreversible cerebral and brain stem dysfunction possibly attributable to toxic postinoculation encephalopathy.[13]

Michael died on December 5, 1971 at 3:56 p.m. The pathologist found that his death resulted from respiratory failure and acidosis due to congestive atelectasis,[14] the cause of which could not be determined. Essentially, the autopsy diagnosis was one of crib death or sudden infant death syndrome.[15]

Dr. Mark Geier, petitioner's expert witness, is board certified in genetics, conducts` medical research, and has developed a special expertise on the toxic effects of the DPT vaccine.[16] He reviewed all of Michael's medical, hospital and autopsy records and heard the testimony of petitioner.[17] Based upon his review, Dr. Geier found that Michael was a normal, well child before the DPT shot. In his opinion, Michael suffered both an HHC and an encephalopathy within 36 hours after the administration of the DPT vaccine, which caused his death.[18]

## DISCUSSION

■ The Act requires the petitioner to establish the following elements by a preponderance of the evidence [19] before compensation can be awarded: (1) that Michael

---

6. Transcript of hearing held on September 14, 1989 at 11–19 [hereafter cited as "tr. ____"]; hearing exhibit 1 [hereafter cited as "ex. ____"].

7. These well-baby visits occurred in early November, 1971, and on December 1, 1971. Tr. 21, 24; ex. 4.

8. Tr. 22–25; ex. 3, 4.

9. Tr. 28, 32, 57; ex. 3, 4.

10. Tr. 38–42.

11. Tr. 44–47.

12. Ex. 3.

13. Ex. 4.

14. Ex. 5. Acidosis is the accumulation of acid or depletion of alkali in the blood and body tissues; a decrease in pH. Atelectasis is the collapse of a lung. *Dorland's Illustrated Medical Dictionary* at 17, 161 (27th ed. 1988).

15. The completely unexpected and unexplained death of an apparently well, or virtually well, infant. The cause is uncertain. *Merck* at 1049.

16. Ex. 7. Dr. Geier has exhaustively reviewed and is familiar with the medical and scientific literature on the adverse reactions to DPT. Tr. 102.

17. Tr. 70.

18. Tr. 72–74, 83,. 88–89, 100.

19. § 300aa–13(a)(1).

received a vaccine listed in the Vaccine Injury Table [hereafter "Table"] (2) in the United States; (3) that he sustained an injury listed on the Table within the specified time limits; (4) that he died from the administration of the vaccine; and (5) that petitioner has not previously collected a judgment or settlement in a prior or pending civil action.[20] The petition must be brought by the legal representative of the decedent.[21] In addition, the petition must fail if a preponderance of the evidence establishes that the claimed injury is due to some factors unrelated to the vaccine.[22]

Section 300aa–14(a) lists DPT as a covered vaccine. The Table lists an HHC which occurs within three days as a compensable injury. It also lists an encephalopathy which occurs within three days as presumptively compensable. Upon close examination of the record, there is a preponderance of credible evidence that Michael suffered both an encephalopathy and an HHC within three days after the administration of the DPT vaccine.

In considering the testimony presented at the hearing, the undersigned found all petitioner's witnesses to be credible and convincing and thus finds that Michael's case satisfactorily fits the Table. Dr. Geier clearly states that Michael's HHC and encephalopathy are attributable to the December 1, 1971 DPT vaccination.[23] In the three days after the DPT vaccination, Michael displayed six out the nine symptoms described in the Act as evidence of an HHC.[24] During that same critical time period, Michael also exhibited six symptoms

which are characteristic of an encephalopathy as defined by the Act.[25] The Secretary admits that a preponderance of the evidence proves that Michael died as a result of an encephalopathy suffered within three days of receiving a DPT vaccination. The Secretary further acknowledges that no preponderance of the evidence demonstrates that Michael's injury or death was due to factors unrelated to the vaccine.[26]

The other essential jurisdictional facts required by the Act are also conclusively established. Michael received a DPT vaccine in the United States (Tempe, Arizona) on December 1, 1971 [27] and died on December 5, 1971.[28] Petitioner has not previously collected a judgment or settlement in a prior or pending civil action.[29] Having been judicially appointed special administrator of Michael's estate,[30] the petitioner has established the requisite capacity to bring this compensation action. For the foregoing reasons, the undersigned concludes that petitioner's eligibility for compensation is supported by a preponderance of the evidence and the concurrence of the Secretary. Once the petitioner navigates past the threshold of entitlement to compensation, under § 300aa–15(a)(2), Michael's estate is entitled to an award of $250,000 [31] and reasonable attorneys' fees and other costs.

## ATTORNEYS' FEES AND COSTS

The Act provides that a judgment awarding compensation shall include an amount to cover reasonable attorneys' fees and other costs.[32] This court has decided that the

---

**20.** § 300aa–11(c)(1).

**21.** § 300aa–11(b)(1)(A).

**22.** § 300aa–13(a)(1)(B).

**23.** *See* note 18 *supra.*

**24.** Michael suffered decreased muscle tone, loss of color and turning blue, unresponsiveness to environmental stimuli, depression and loss of consciousness, and respiratory arrest. Tr. 39–50; ex. 3–5. *See* § 300aa–14(b)(1).

**25.** Michael suffered high fever, high pitched and unusual screaming, persistent unconsolable crying, bulging fontanelle, a seizure, and a change in the level of consciousness lasting at least six

hours. Tr. 39–50; ex. 3–5. *See* § 300aa–14(b)(3).

**26.** *See* Secretary's letter.

**27.** Tr. 28, 32, 57.

**28.** Ex. 5.

**29.** Tr. 56.

**30.** Ex. 6.

**31.** § 300aa–15(a)(2).

**32.** § 300aa–15(e).

appropriate method for computing attorneys' fees awarded under the Act is the "lodestar" model. *See Gregson v. Secretary of Health and Human Services*, No. 88–1V, special master's report at 7 (Cl.Ct., April 24, 1989). The lodestar is the product of the reasonable hours expended times a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

The fee applicant carries the burden of proof. To meet such burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As the Claims Court in *Martin v. United States* wrote:

> A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.[33]

Petitioner's attorney, Anthony M. Colantoni, has claimed the sum of $12,703 for attorneys' fees and $4,815.53 for costs, for a total of $17,518.53.[34] Specifically, he claims expending 43.9 attorney-hours at a requested rate of $290 per hour, and 17.4 hours of paralegal time at $40 per hour. Petitioner's costs are also itemized.[35]

■ In calculating a reasonable hourly rate, a court must consider the prevailing market rates in the relevant community for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). The Supreme Court noted in *Blum* that:

> determining an appropriate 'market rate' for the services of a lawyer is inherently difficult.... To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11.

■ Mr. Colantoni, claims that his requested $290 hourly rate is within the market rates prevailing in Chicago, Illinois.[36] Over the past ten years, Mr. Colantoni's firm has represented over 500 persons injured by DPT in litigation. Mr. Colantoni is active in the Association of Trial Lawyers of America's DPT Litigation Group and is nationally recognized as one of the leading trial attorneys in the field of DTP vaccine litigation. He has consulted with Dissatisfied Parents Together in drafting the Act and lobbying Congress for the enactment of the National Vaccine Injury Compensation Program and was a charter member of Advocates for a Safe Vaccine.[37] Mr. Colantoni was appointed by the Secretary to the Advisory Commission on Childhood Vaccines.[38] Mr. Colantoni also submitted an affidavit of Robert J. Glenn[39] attesting to the reasonableness of his rate in the Chicago community.

Although counsel's qualifications, experience and his presentation of this case merit a top hourly rate, the undersigned finds the

---

**33.** *Martin v. United States*, 12 Cl.Ct. 223, 227 (1987), *citing, Hensley v. Eckerhart, supra.*

**34.** *See* Application for Attorneys' Fees and Costs, filed on Oct. 3, 1989 [hereafter "Fee Application"]. Petitioner's counsel included $696 claim for paralegal time in his claim for costs. Since these are not true costs and disbursements, the paralegal services should properly be claimed as part of professional fees.

**35.** Fee Application, ex. 2, 3.

**36.** Fee Petition at 2; *see The Lawyer's Almanac 1989*, Billing Rates at 47 Major U.S. Law Firms at 117 (partner rates in Chicago firms ranging from $125 to $325).

**37.** Fee Application at 3–4.

**38.** *See* § 300aa–19.

**39.** *See* Fee Application, ex. 1.

$290 rate contravenes Congressional intent to control costs under the Act.[40] Moreover, since this case involved the *ex parte* proof of two sequelae clearly on the Table, petitioner's litigative risk of loss was minimal. No proof of negligence or breach of warranty in the manufacture or administration of the vaccine was required and no difficult or complex factual, medical or legal issues were raised. Accordingly, a rate of $250 is reasonable and adequate to compensate counsel for his able presentation of the petition's case.

■ To demonstrate reasonable hours worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition. Failure to keep records can result in a drastic reduction of fees. *Grendel's Den v. Larkin*, 749 F.2d 945, 952 (1st Cir.1984). In reporting time expended, the applicant need not account for every minute. However, counsel should at least identify the general subject matter of his claimed time expenditures. *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. Once counsel appropriately identifies his time, those hours which reflect excessive, redundant, and otherwise unnecessary hours must be excluded by the court. In requesting statutory fees, an attorney must use the same billing judgment as an attorney would in billing a client. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority. *Id.* at 434, 103 S.Ct. at 1939.

Virtually all of petitioner's hours are well documented and accounted. Each task is delineated with a reasonable and appropriate time expenditure attached. Counsel is commended for the cost effective use of paralegals this case.

■ Therefore, the allowable fees should be computed as follows: 43.9 attorney hours at $250 an hour equal $10,975, and 17.4 paralegal hours at $40 per hour equal $696. Adding the total attorneys' fees of $11,671 to the $4,119.53 costs equals the total sum of $15,790.53. Accordingly, it is recommended that the Court's judgment include the sum of $15,790.53 for petitioner's fees and costs.[41]

The Secretary's late concession of compensation entitlement caused some disturbing consequences in this case. First of all, it required the needless expenditure of judicial resources to hold a hearing and transcribe the testimony. Secondly, it resulted in an unnecessary disbursement of $11,997.56 [42] from the Vaccine Injury Compensation Trust Fund to compensate petitioner for attorneys' fees and costs to prove her case. Finally, the interests of the vaccine compensation program, the Secretary and the Court are not being served by agency attorneys and staff, who ignore court-imposed deadlines.

## CONCLUSION

In view of the foregoing, the undersigned recommends to the Court that peti-

---

**40.** *See* H.R.Rep. 908, 99th Cong., 2d Sess. 22, *reprinted in* 1986 U.S.Code Cong. & Admin. News 6287, 6344, 6363; H.R.Rep. 391, 100th Cong., 1st Sess. 690–701.

**41.** Of course, the Act's provision mandating the petitioner's award in retroactive cases be made in four annual installments does not apply to Mr. Colantoni's attorneys' fees. § 300aa–15(f)(4)(B). Section 300aa–15(b) does refer to attorneys' fees with the awards for pain and suffering and lost wages as a permissible expenditure under the $30,000 umbrella in retroactive cases. Nonetheless, to read "compensation to a petitioner" for the purposes of § 300aa–15(f)(4)(B) to include attorneys' fees strains statutory logic. As incentive for attorneys to accept vaccine cases, Congress included

a fee provision. Congress' vision of fees and costs as distinct from "compensation" is further evidenced since attorneys' fees are available even where no compensation is awarded. § 300aa–15(e)(1). In addition, the statute explicitly forbids attorneys from engaging in alternative fee arrangements. § 300aa–15(e)(3). Finally, any other construction would unfairly penalize attorneys in retroactive cases, thereby discouraging them from accepting those petitioners as clients. Such an enigmatic result clearly was not contemplated by the statute.

**42.** The undersigned calculates that 31.7 attorney hours ($7,925), 2 paralegal hours ($80), and $3,992.56 in costs were unnecessarily expended in this case, constituting over 75% of the total fee award.

tioner be granted judgment for $265,-790.53.