**In re SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.**

**Pasquale MASSARO, et al., Appellants,**

v.

**Stanley CHESLEY, et al., Appellees.**

**In re SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.**

**Richard BIEDER, et al., Appellants,**

v.

**Stanley CHESLEY, et al., Appellees.**

Nos. 95–2285, 96–1142.

United States Court of Appeals, First Circuit.

Argued Aug. 1, 1996.

Decided April 22, 1997.

222

Judith Resnik, New York City, with whom Dennis E. Curtis, Richard A. Bieder, Koskoff, Koskoff & Bieder and José E. Fernandez–Sein, were on brief, for appellants.

Will Kemp, Las Vegas, NV, with whom Harrison, Kemp & Jones, Chtd., was on brief, for appellees.

Before SELYA, CYR and LYNCH, Circuit Judges.

CYR, Circuit Judge.

Plaintiffs and their counsel appeal from a district court order awarding the Plaintiffs' Steering Committee ("the PSC") approximately $10,670,000 for costs incurred in representing plaintiffs in this mass-tort litigation. We affirm the district court order in substantial part and direct appellees to remit $1,023,903 ($913,503 in PSC "expert" fees, and $110,400 in photocopying charges).

# I

## BACKGROUND [1]

Ninety-seven people perished in a tragic New Year's Eve fire at the San Juan Dupont

---

**1.** We relate only the record facts directly material on appeal. The following cases offer the hardy reader a more complete history of these marathon proceedings at the appellate level. *See In re Three Additional Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,* 93 F.3d 1 (1st Cir.1996); *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295 (1st Cir.1995); *In re San Juan Dupont Plaza Hotel Fire Litig.,* 45 F.3d 569 (1st Cir. 1995); *In re San Juan Dupont Plaza Hotel Fire* *Litig.,* 45 F.3d 564 (1st Cir.1995); *In re Two Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,* 994 F.2d 956 (1st Cir.1993); *In re San Juan Dupont Plaza Hotel Fire Litig.,* 989 F.2d 36 (1st Cir.1993); *In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,* 982 F.2d 603 (1st Cir.1992); *In re San Juan Dupont Plaza Hotel Fire Litig.,* 907 F.2d 4 (1st Cir.1990); *In re San Juan Dupont Plaza Hotel Fire Litig.,* 888 F.2d 940 (1st Cir.1989).

Plaza Hotel on December 31, 1986, and many others sustained serious personal injuries and property losses. After thousands of individual plaintiffs filed hundreds of claims against a host of defendants in many different jurisdictions ("multidistrict litigation" or "MDL"), the Judicial Panel on Multidistrict Litigation consolidated all cases for trial in the United States District Court for the District of Puerto Rico (Acosta, J.), *see* 28 U.S.C. § 1407.

As most plaintiffs had already retained their own counsel (hereinafter: "individually retained plaintiffs' attorneys" or "IRPAs"), the district court recognized the need to coordinate their representation through the PSC. Eventually comprised of eleven attorneys with expertise in mass-tort litigation, the PSC served as plaintiffs' lead counsel, responsible for coordinating discovery, settlement negotiations and, if necessary, trial matters common to all plaintiffs. The eleven PSC members nonetheless retained their respective roles as IRPAs, directly representing approximately seventy percent of the individual plaintiffs. The IRPAs, on the other hand, were to focus their efforts on litigation tasks idiosyncratic to their respective clients' cases.

## A. *Pretrial Case–Management Orders*

In two pretrial orders, the district court directed plaintiffs, who would derive common benefit from PSC services, to pay PSC attorney fees and costs from the common fund ultimately recovered in the litigation. *See* Pretrial Order No. 127 (Dec. 2, 1988); Pretrial Order No. 2 (Mar. 23, 1987). At the time, the district court tentatively proposed to limit the PSC to a combined attorney fee/cost award not exceeding ten percent of the eventual common fund, *see* Pretrial Order No. 127, at 48, which ultimately approximated $220 million. The district court established the following cost-submission and reimbursement guidelines:

> [A]ssessments [2] will be deposited in a fund that will defray the reasonable ex-

penses of the PSC in the performance of its duties. The PSC shall maintain a careful statement of account on the fund, that is, prepare and keep *accurate, contemporaneous, detailed records* of the *receipts,* deposits, accumulated interest and subsequent disbursements. The fund shall be used only to make disbursements (whether directly to creditors or to reimburse the PSC) for expenses incurred for the benefit of all plaintiffs. Any disbursements made for the benefit of a particular plaintiff represented by a member of the PSC shall be the sole responsibility of the plaintiff in question.

The PSC shall be authorized to periodically expend monies from the fund as needed to defray the *necessary* "hard" costs of its work, such as office overhead, staff salaries, warehousing, duplication, expert fees, deposition costs, etc. The members of the PSC shall be reimbursed from time to time for the "hard" expenses of the PSC-related work incurred by them or their employees/appointees, provided they submit to the PSC *careful, contemporaneous, detailed records* of their expenditures.

"Soft" costs such as travel, meals, transportation, lodging, etc., shall be borne by the individual PSC members who shall be reimbursed at the conclusion of this litigation or as otherwise provided by the Court. All persons interested in reimbursement, particularly members of the PSC, must keep *careful, contemporaneous, detailed records* of individual expenses. Only *reasonable* and *necessary* expenses will be reimbursed. For example, airplane/transportation expenses should be at economical rates, not first class; and hotel accommodations/meals should be *moderate, not deluxe,* etc. Reimbursements are conditioned, of course, on the *proper verification* of expenses.

The PSC and/or its members, as pertinent, shall submit to the Court *for its approval* a statement for reimbursable "hard" expenses and another for "soft" expenses as well as statements of account

---

**2.** As commonly occurs in mass-tort MDLs, plaintiffs' attorneys, *inter alios,* were required to advance and pool the monies needed to fund their clients' litigation, including the interim-cost peti-

tions filed by the PSC and its members. *See* Pretrial Order No. 127, at 37–43. Reimbursement for their advances were contingent upon their recoveries from defendants.

beginning on August 1, 1987 and *every sixty (60) days* thereafter.

*Id.* at 44–45 (emphasis added). *See also* Pretrial Order No. 2, at 14.

## B. *The PSC–Office Cost Regimen*

Although individual PSC members performed some PSC litigation tasks through their individual law firms, the district court also authorized the PSC to recover its direct costs in establishing, staffing, and operating a centralized PSC Office (hereinafter: "PSC–Office costs"). Further, the PSC bylaws required prior approval, by five PSC members, for any PSC-office cost reimbursement above $500, as well as payment of such costs by PSC check.

In March 1987, certified public accountant ("CPA") Donald Kevane was retained to review and submit to the PSC monthly reports summarizing PSC-office costs. In February 1991, the PSC submitted its final report to the district court, claiming $6,956,368 in PSC-office costs attributable to Phases I and II of the litigation.[3]

## C. *The PSC–Member Cost Regimen*

Similarly, the district court authorized reimbursements of costs incurred by the eleven individual PSC members in perform ing PSC litigation tasks (hereinafter: "PSC-member costs"), as distinguished from their respective duties as IRPAs. Every sixty days, the PSC submitted, under seal and *"for* [court] *approval,"* a consolidated report summarizing each PSC member's individual "hard" and "soft" costs. (Emphasis added.)[4]

In September 1989, the district court appointed C. Terry Raben, a CPA, to "review the [PSC-member cost] information supplied to ... date to ensure it is *complete, accurate* and *contemporaneous* [,] as well as to organize the reports before the sheer number of them unduly complicates any reasonable accounting procedures." Order No. 222 (docket No. 12671, entered under seal Sept. 15, 1989). Raben previously had performed comparable cost oversight responsibilities in another mass-tort litigation. *See generally In re MGM Grand Hotel Fire Litig.,* 660 F.Supp. 522 (D.Nev.1987) (or "the *MGM* case"). The district court directed Raben to scrutinize the PSC files for compliance with the criteria in Pretrial Order No. 127, *supra,* to obtain any additional documentation deemed appropriate, and submit findings to the court.

In November 1990, almost four years into these proceedings, the PSC became concerned that outside accountants like Raben, who were not attorneys and lacked intimate knowledge of the PSC's litigation responsibilities and inner workings, might not adequately appreciate whether PSC-member cost claims met the compliance criteria prescribed in Pretrial Order No. 127. Accordingly, the PSC directed Monita Sterling, a paralegal for a PSC-member law firm with prior exposure to PSC litigation tasks, to review each PSC-member cost claim independently to determine whether the expenditures were "necessary" to legitimate PSC litigation tasks, "reasonable" in amount, and not duplicative of other PSC-member cost claims. Sterling thereafter reviewed "every receipt or other piece of documentation submitted," noting

---

**3.** Phase I involved liability claims against the hotel and its affiliates, whereas Phase II involved claims against the suppliers of goods and services to the hotel. The district court has yet to rule on attorney fees and costs attributable to Phase III, which allocated liability among defendants' various insurers. *See In re Nineteen Appeals,* 982 F.2d at 608–10 .(determining that Phase I and II cost awards were final, appealable orders).

**4.** On July 2, 1987, the district court approved PSC bylaws. Article XI, entitled "Accounting and Expense Management," provided, *inter alia,* that: (1) all PSC members were to "insure the exact and efficient management of plaintiffs' resources by strictly complying with proper ac-

counting and expense management principles ... [as] set forth in the Orders of the Court, in the *Manual for Complex Litigation,* and herein," *id.* § 11.01 (emphasis added); (2) PSC members were to submit to the PSC secretary every 60 days a standardized form listing their total costs, broken down into ten broadly enumerated categories (*e.g.,* "air travel," "hotels and meals"), *id.* §§ 11.02, 11.03 & 11.05; (3) the PSC Secretary was to consolidate these member reports for submission to the district court, with the individual members' summary reports attached, *id.* § 11.04; and (4) the PSC Secretary would nominate an auditor for appointment by the court, *id.* § 11.07.

each questionable claim.[5] Sterling submitted her reports and supporting documentation to Adamina Soto, a CPA who reviewed the Sterling report and randomly checked its underlying documentation, then contacted PSC members about problem items and requested further documentation. Soto eventually disallowed $207,475 in costs and submitted her reports to Raben.

Raben submitted three final reports to the district court, covering PSC-member cost claims through January 31, 1991.[6] He disallowed an additional $138,569 of the total $3,847,233 in claimed expenditures. The district court approved each Raben report as submitted. *See In re San Juan Dupont Plaza Hotel Fire Litig.*, 768 F.Supp. 912, 934 (D.P.R.1991), *vacated on other grounds*, 982 F.2d 603 (1st Cir.1992). PSC members ultimately recovered $3,708,665. *Id.*

### D. Attorney Fee/Cost Rulings

In February 1991, the PSC submitted its final application for cost reimbursements, attaching the report previously prepared by Donald Kevane and requesting $6,956,368 in PSC-office costs attributable to Phases I and II. *See supra* at p. 224. Three months later, the district court abandoned its earlier tentative proposal, *see supra* at p. 223, to limit the PSC's combined attorney fee/cost award to ten percent of the common fund. Thereafter, the court approved the entire PSC fee/cost application. *See* Order No. 346 (June 21, 1991).

On appeal, we vacated the fee/cost award for failure to afford the plaintiffs and IRPAs a meaningful opportunity to challenge the PSC attorney fee application on the merits. Accordingly, we remanded for further proceedings. *See In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 608, 615–16 (1st Cir.1992) [hereinafter *"Nineteen Appeals"*]. Following the remand and a second appeal, the PSC and IRPAs were directed to share the available attorney-fee fund ($68 million) equally. *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 312 (1st Cir.1995) [hereinafter *"Thirteen Appeals"*].

Following the remand in *Nineteen Appeals,* the district court separately reconsidered the PSC application for costs, fixing March 12, 1993, as the deadline for the plaintiffs and IRPAs to submit "specific/detailed written objections" to all PSC-cost submissions through January 31, 1991. *See* Order No. 478 (Jan. 15, 1993). The court further directed three categories of documents to be filed in the joint document depository ("JDD") for review by the plaintiffs and IRPAs: (1) the three Raben reports analyzing PSC-member costs; (2) the Kevane monthly reports summarizing PSC-office costs; and (3) the PSC-member cost documentation. *See* Order No. 479 (Jan. 20, 1993). Although the court rejected a request by the plaintiffs and IRPAs for additional formal discovery, *see Thirteen Appeals,* 56 F.3d at 303 (noting that mandated exchanges of documentation, rather than "searching discovery," are appropriate where only attorney fees and expenses are at issue), it ordered both Raben and Kevane to submit descriptions of their auditing procedures and directed Kevane to pro-

---

5. Sterling, who had acquired extensive prior experience in the *MGM* case, established eleven criteria for determining whether PSC-member costs were reimbursable: (1) major expenditures only if documented by receipts; (2) minor expenditures (*e.g.,* tips, payphone charges), for which the use of receipts was impracticable, only if supported by affidavit; (3) coach air fare only; (4) federal express charges if documented by airbills designating origin and destination; (5) long distance phone charges if documented according to date, number, duration, and cost; (6) photocopying expenditures at 25 cents per page and postage charges at actual cost if the member indicated compliance with normal in-house procedure at the member's law firm for tracking these costs; (7) telefax charges at actual cost, not at a page rate; (8) secretarial expense if specifically authorized by the PSC; (9) costs relating to equipment placed at the PSC Office for use by PSC staff; (10) no reimbursement for court-ordered monetary sanctions imposed on the PSC; and (11) duly authorized miscellaneous costs only if "reasonable and necessary in the prosecution of the case, ... for the benefit of the PSC and the plaintiffs as a whole, and not for individual clients."

6. These reports were dated: March 13, 1990 (costs from January 1987 to September 1989); October 12, 1990 (costs from October 1989 to March 1990); and February 20, 1991 (costs from April 1990 to January 1991).

duce his working papers, correspondence, and documentation. *See* Order No. 485 (Mar. 3, 1993).

Within the extended deadline for further objections to costs, the plaintiffs and IRPAs submitted a report and affidavit by William Torres, a CPA newly retained to audit the PSC-cost submissions, attesting that he had requested the PSC to "provide [him] with access to all of the records documenting the costs incurred in this case, . . . including but not limited to, original bills or statements kept by the PSC staff or any PSC member, and any summaries or supporting documentation (including charge account bills) of the same." Even though necessary to a "meaningful analysis," Torres attested, the PSC failed to provide the requested documents, including the Raben working papers; and, until March 10, 1993, the "critical" Kevane working papers were not made available; many documents made available were unreadable; the PSC did not allow access to the PSC-member-cost-reimbursement policies or the PSC-policy meeting minutes relating to cost reimbursements; and, finally, the PSC refused to permit him to depose Raben, Kevane or any PSC member regarding questionable cost submissions or documentation.

On November 24, 1993, the district court overruled most major objections to the PSC-cost submissions. *See* Order No. 510–A. For example, as regards hotel charges, the court rejected the contention that the maximum per diem rate should be $116, the rate considered "reasonable" by the IRS for tax-deduction purposes. It ruled that reasonableness must be assessed case by case, to reflect such variants as locale, seasonal fluctuations, room availability, the number of persons sharing a room, accessibility of equipment and facilities essential to the litigation task at hand, as well as other exigencies. *Id.* at 7–8. The court ruled that, like the IRPAs, PSC members were entitled to "reasonable" reimbursement for photocopying costs and had not "profit[ed]" from the authorized twenty-five-cents-per-copy rate. *Id.* at 9.

The district court further noted, *inter alia*, that the objections the plaintiffs and IRPAs made to the PSC-cost submissions were so voluminous and entwined with issues relating to attorney fees that it was difficult to determine the particular costs to which the plaintiffs and IRPAs were objecting. It directed the plaintiffs and IRPAs to "sort out this chaos," *id.* at 12; Torres and Sterling to meet and consult at the JDD not later than December 10; and the plaintiffs and IRPAs to file particularized objections to the remaining expenditures not later than January 12, 1994.

The district court conducted an evidentiary hearing in December 1993, to determine whether to allow the PSC to recover its final cost installment for retaining Thomas Foulds, Esquire, as an expert. The PSC maintained that Foulds, who had worked for many years in the insurance industry before attending law school, had been retained as an *insurance expert*, to interpret insurance contracts, rather than as an attorney, and that his fee therefore was fully reimbursable as a PSC-office cost. *See* Pretrial Order No. 127, at 48. Although the plaintiffs and IRPAs objected that Foulds had performed many litigation tasks, including legal research and conducting depositions, normally performed by attorneys and not by insurance experts, the district court allowed the Foulds fee reimbursement as a PSC-office cost after concluding that Foulds "was not contracted merely as an attorney" but primarily for his insurance expertise. *See* Order No. 520, at 3–4 (Jan. 28, 1994). The final installment brought the total Foulds-fee reimbursement to $913,503.[7]

The plaintiffs and IRPAs filed their final objections to PSC-member costs in January 1995, essentially reiterating that the cost review and verification process had proven hopelessly inadequate to document either the necessariness or reasonableness of the claimed costs, and that it was unfair to require them to sort through the chaotic docu-

---

**7.** The district court had approved two prior PSC reimbursements relating to Foulds, totaling $850,000. *See* Margin Order No. 755 (filed under seal Dec. 27, 1990); Order No. 398 (filed under seal Oct. 15, 1991). The final PSC installment of $84,107 was disallowed in part, due to deficiencies in contemporaneous documentation.

mentation created by the PSC and its members. Alternatively, the plaintiffs and IRPAs asserted specific objections to a sampling of allegedly inappropriate PSC-member costs (*e.g.*, phone calls, tips, charges for "drinks," etc.) and urged an across-the-board reduction of all PSC-cost claims by a fixed percentage (25–33%) to reflect the sampling-based estimate of alleged PSC overcharges. Finally, the plaintiffs and IRPAs complained that Monita Sterling had refused to allow CPA Torres to inspect the documentation pertaining to PSC-office costs at the joint meeting required by Order No. 510–A.

The district court once again overruled the bulk of the objections. *See* Order No. 584 (Aug. 29, 1995). First, it found the PSC review process adequate, noting that it had resulted in disallowance of several questionable expenditures based on the independent review conducted by Raben, Sterling, and Soto under objective criteria. Second, except for a handful of *de minimis* mischarges totaling less than $2,000, the court rejected the specific challenges asserted by the plaintiffs and IRPAs based on their samplings of alleged overcharges. Finally, the court ruled that its Pretrial Order No. 510–A, *see supra* at pp. 225–26, had envisioned only that Sterling and Torres inspect documentation relating to "outstanding issues"—those involving PSC-member costs, not PSC-office-cost issues.

In due course, the plaintiffs and IRPAs [hereinafter: "appellants"] appealed from the various orders approving PSC-cost reimbursements (Order Nos. 478, 485, 510–A, 520, and 584).

## II

### DISCUSSION

#### A. *The PSC–Cost Reimbursement Regimen*

##### 1. *Appellants' Position*

Appellants aim their main broadside at the regimen established for documenting, monitoring, submitting, and approving PSC costs. Although the PSC, IRPAs, and plaintiffs in mass-tort MDLs share the same litigation goal (*viz.*, an optimum common fund),

internecine differences as to subsidiary matters—particularly the appropriate allocations from the common fund for their respective attorney fees and costs—are commonplace. The greater the attorney fees and costs awarded the PSC, of course, the less available for the IRPAs and their individual clients. Appellants maintain that these conflicting self-interests necessarily entail heightened oversight responsibilities on the part of the district courts in mass-tort MDLs to ensure stringent monitoring and review procedures adequate to protect the individual plaintiffs and IRPAs from overreaching by the PSC.

Appellants fault the district court for adopting reimbursement procedures which delegate important judicial oversight responsibilities to auditors appointed either by the court or the PSC. It is the PSC, they say, rather than the appellants, which must bear the ultimate burden in establishing entitlement to reimbursement, *see Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 956–57 (1st Cir.1984), which in turn necessitates three distinct showings by the PSC for each claimed reimbursement; *viz.*, that it document: (i) the *actual expenditure;* (ii) its *necessariness* to the assigned litigation task; and (iii) its *reasonableness, see, e.g., In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1296, 1314 (E.D.N.Y.1985) ("Expenses must be both reasonable in amount and reasonably related to the interests of the class."), *aff'd in pertinent part*, 818 F.2d 226, 238 (2d Cir. 1987).

Appellants contend that the Raben and Kevane "audits" did not inform the district court adequately regarding potential PSC excesses. Raben and Kevane were accountants, neither trained in the law nor familiar with the litigation tasks assigned to the PSC. At best they could verify that the PSC and its members actually made the claimed expenditures, but in many instances PSC members maintained no detailed records relating to their reasonableness and necessariness. Moreover, appellants argue, though Monita Sterling and others similarly designated by the PSC undoubtedly were more familiar than Kevane and Raben with the nature and demands of the PSC's litigation responsibili-

ties, their assessments of claimed expenses were inherently biased because their employment with the PSC gave them a vested interest in justifying PSC reimbursements.

Appellants contend that the district court erred in suggesting that it was incumbent upon them, rather than the PSC, to demonstrate that particular PSC expenditures were not reimbursable. *See, e.g.,* Order No. 520, at 1 n. 1 ("Parties questioning payments previously approved carried the burden of setting them aside whereas the PSC/Mr. Foulds were required to justify the pending request."). The court based its ruling on the ground that most PSC cost-reimbursement claims during earlier stages in the litigation had been approved, without opposition, as submitted.

Appellants complain not only that the district court thereby subverted the well-established burden of proof incumbent upon the PSC, *see Grendel's Den,* 749 F.2d at 956–57, but foisted on the plaintiffs and IRPAs the impracticable task of rummaging through mountainous PSC documentation to determine—within very restrictive court-ordered deadlines—which PSC-cost submissions were either inadequately documented or otherwise nonreimbursable. Appellants therefore urge that all otherwise allowable PSC-cost reimbursements be reduced by a fixed (if somewhat arbitrary) discount (25% to 33%), *see, e.g., Mokover v. Neco Enters., Inc.,* 785 F.Supp. 1083, 1093–94 (D.R.I.1992), to reflect the likely extent to which the PSC inferably overcharged due to its failure to maintain "appropriate" documentation.

### 2. *Standard of Review*

■ District court orders awarding costs normally are reviewed only for abuse of discretion. *See Grendel's Den,* 749 F.2d at 950; *see also Anderson v. Secretary of Health & Human Servs.,* 80 F.3d 1500, 1507 (10th Cir. 1996); *National Info. Servs., Inc. v. TRW, Inc.,* 51 F.3d 1470, 1471 (9th Cir.1995); *Estate of Borst v. O'Brien,* 979 F.2d 511, 517 (7th Cir.1992) ("The award of costs 'is the type of discretionary ruling to which appellate courts should give "virtually complete" deference.' ") (citations omitted).

### 3. *"Burdens of Proof"*

■ The PSC and its members undoubtedly must establish their entitlement to reimbursement. *See Grendel's Den,* 749 F.2d at 956–57. Furthermore, there can be no quarrel that the respective self-interests of the plaintiffs, the IRPAs, and the PSC in mass-tort MDLs often diverge, nor for that matter that the cost-containment regimen initiated at the outset in this case (without benefit of hindsight) ultimately proved inadequate and even chaotic, *see supra* Section I.D, as the district court itself acknowledged several years later.

■ We nevertheless part company with appellants' contention that the belatedly perceived shortcomings in the adopted safeguards against PSC overreaching proximately *caused* the unsatisfactory regimen in this case, or that the PSC and its members must therefore be required to bear the entire brunt of its failure to function as envisioned by the district court. Quite apart from formal burdens of proof, all litigants must share in their mutual obligation to collaborate with the district court *ab initio* in fashioning adequate case management and trial procedures, or bear the reasonably foreseeable consequences for their failure to do so. *See, e.g., Reilly v. United States,* 863 F.2d 149, 160 (1st Cir.1988) (noting that district court reasonably may presume affected parties, which take no exception to an announced course of action, have no objection); *see also Clemente v. Carnicon–Puerto Rico Mgt. Assocs.,* 52 F.3d 383, 387 (1st Cir.1995); *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 913 (1st Cir.1989); *Austin v. Unarco Indus., Inc.,* 705 F.2d 1, 15 (1st Cir.), *cert. dismissed,* 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983).

■ As the lawbooks bear out, in many respects this has been a groundbreaking mass-tort MDL from its onset in 1987. *See, e.g., supra* n. 1. The district court was confronted not only with the daunting task of devising (sometimes from "whole cloth") mechanisms for streamlining case administration (*e.g.,* the JDD), but with establishing auxiliary administrative entities, including the PSC itself, which would permit adequate ongoing judicial oversight to be reserved for

the most pressing and essential litigation. The PSC, IRPAs, and plaintiffs were indispensable partners in this important endeavor. Spurred by their respective self-interests, these broadly allied litigants were far better positioned than the trial judge to propose the prophylactic procedures believed necessary to protect their respective interests from undue encroachment by potential adversaries, including one another.

These complex and unwieldy "mass tort cases are a breed apart," *Thirteen Appeals*, 56 F.3d at 311, to the point that efficient, and often innovative, administrative arrangements become absolutely essential to enable the "court[ ][to] run [a] tight ship[ ] to ensure that [the] litigation stays on course." *Nineteen Appeals*, 982 F.2d at 614. *See In re Recticel Foam Corp. (In re San Juan Dupont Plaza Hotel Fire Litig.)*, 859 F.2d 1000, 1004 (1st Cir.1988) ("In multi-party, multi-case litigation, the district court's success is largely dependent upon its ability to uncomplicate matters."). Trial judges newly immersed in mass-tort MDLs simply cannot reasonably be expected to anticipate, from the inception, all potential flaws in their unopposed procedural and administrative initiatives.

It is essential, therefore, that counsel collaborate with the trial judge from the outset in fashioning workable programmatic procedures, and thereafter alert the court in a timely manner as operating experience points up infirmities warranting further judicial attention. Absent this collaborative administrative monitoring, there inevitably remains an unacceptable potential for internecine conflicts among the PSC, IRPAs and plaintiffs over their respective dormant claims to the common fund, which threaten to convert their cost-reimbursement disputes into wasteful satellite litigations. *See Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (cautioning that cost claims "should not [be allowed to] result in a second major litigation").

Even at the outset, while their primary focus remained on establishing defendants' liability, the PSC, IRPAs, and plaintiffs surely could anticipate that their respective financial stakes in future PSC-cost reimbursement rulings would be substantial (*e.g.*, $10 million, or 4 1/2 percent of common fund), especially since the district court had authorized the PSC not only to take over certain IRPA litigation tasks but to establish and finance its own *ad hoc* law firm at a centralized and inevitably costly adjunct office. Confronted with this serious potential for conflicting self-interests, *see* Pretrial Order No. 2 (cautioning counsel that "your working relationship will occasionally be strained, communication hampered, and mutual trust impeded"), and the virtually certain prospect that the massive litigation would be protracted, *see id.* (cautioning that counsel would "probably be laboring together [in strained relationships] for several years"), the PSC, IRPAs, and plaintiffs were on reasonable notice from the outset that establishing adequate prophylactic procedures was a priority matter.

Thus forewarned, the PSC, IRPAs, and plaintiffs *all* were fairly alerted that the massive cost-submission documentation generated over the years ahead would become critically important to them; *viz.*, to satisfy the PSC's burden of proof under *Grendel's Den* and enable both the IRPAs and plaintiffs to assert informed objections to inappropriate PSC cost-reimbursement submissions. Clearly, then, their timely fashioning of mutually satisfactory documentation and monitoring procedures offered the most reasonable prospect for forfending this satellite litigation. *See Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941.

As appellants acknowledge that there are no legal precedents which provide detailed models for designing suitable mass-tort cost-reimbursement procedures, they now urge, after the fact, that we define the relevant responsibilities incumbent upon the district court and the PSC in these matters. We decline their request, however, in large part for the reason that the guidance presently available plainly runs counter to their premise that the primary responsibility for designing cost-submission procedures, *ab initio*, rests with the district court.

Although the Manual for Complex Litigation ("the *MCL*") itself includes no detailed provisions on the subject, opting instead to

encourage counsel for the principal parties to forge *ad hoc* prophylactic procedures by mutual agreement from the outset,[8] it envisions that prescriptive procedural models will emerge, and deserving ones gain currency, through the litigants' own collaborative *ad hoc* initiatives, rather than originate in appellate case law. *See* Pretrial Order No. 127, at 22 ("The Manual for Complex Litigation ... has been and will continue to be a primary reference text in this litigation. Counsel must become familiar with the Manual."). Furthermore, *ex post facto* pronouncements detailing model procedures would be particularly inappropriate in these circumstances as it is readily apparent that the present dispute sprang inexorably from the flawed procedural design in which appellants acquiesced from the outset, and for six years thereafter, to the point that its deficiencies became both systemic and irremediable. Appellants simply waited too long before asking the district court to undo, with their broad axe (*viz.*, a 25% to 33% across-the-board cut), the documentary muddle allowed to accumulate.

Moreover, pressed on many other fronts since 1987, it was not practicable for the district court alone to scrutinize all cost-related documentation maintained by the PSC for nearly half a decade. *See Grendel's Den,* 749 F.2d at 950 (noting that courts must strive for cost-setting processes which are "not unnecessarily burdensome to the courts themselves"). Unlike less attenuated and complex litigation, mass-tort MDLs by their very nature predetermine that detailed monitoring of case-administration-related responsibilities be delegated. The early pretrial orders entered by the district court, with appellants' acquiescence, accordingly established a cost-monitoring regime which required the PSC to submit cost summaries every sixty days for *interim* approval by the court. The PSC-cost summaries, which merely reflected total expenses by general type and category, represented the cumulative, edited product of the Raben and Kevane "audits," without the underlying documentation. Thus, the interim-approval regime was reasonably designed to ensure that cost verification and containment by the parties not simply await an end to the entire litigation, by which time the accompanying avalanche of documentation would all but preclude cogent review.

■ Nevertheless, two serious deficiencies made their way into these interim-approval procedures with appellants' acquiescence: (1) the failure to include defined criteria for assessing "reasonableness" and "necessariness"; and (2) the failure explicitly to authorize or require appellants to monitor the underlying documentation as interim PSC-cost summaries were submitted to the district court.[9] Thus, appellants settled from

8. The M.C.L. § provides, in relevant part:

> Expenses incurred and fees earned by designated counsel acting in that capacity should not be borne solely by their clients, but rather shared equitably by all benefiting from their services. If possible, the *terms and procedures* for payment should be established by *agreement among counsel,* but subject to judicial approval and control (*see infra* section 24.214, compensation for designated counsel). Whether or not agreement is reached, the judge has the authority to order reimbursement and compensation and the obligation to ensure that the amounts are reasonable. Terms and *procedures* should be established *before* substantial services are rendered and should provide for, among other things, the following: *periodic billings* during the litigation or creation of a fund through advance or ongoing assessments of members of the group; appropriate contributions from parties making partial settlements with respect to services already rendered by designated counsel; and contributions from parties in later filed or as-

signed cases who benefit from the earlier work of designated counsel.

> Designated counsel should render services as economically as possible under the circumstances, avoiding unnecessary activity and limiting the number of persons attending conferences and depositions and working on briefs and other tasks. The court should make clear at the first pretrial conference that compensation will not be approved for unnecessary or duplicative activities or services. The court should also inform counsel what records should be kept and when they should be submitted to the court to support applications to recover fees and expenses from coparties. *See infra* section 24.21, which discusses ground rules and record keeping where attorneys' fees are awarded by the court.

*MCL* § 20.223 (3d ed.1995) (emphasis added).

9. The record discloses no indication that appellants either objected to these deficiencies or proposed alternative procedures. *See Silva v. Witschen,* 19 F.3d 725, 729 n. 4 (1st Cir.1994)

the outset simply for the broad, undefined general criteria that claimed-PSC costs be "necessary" and "reasonable," thereby implicitly foregoing such ongoing prophylactic measures as particularized monetary guidelines and/or ceilings on major cost categories; for example, maximum per diem rates for hotels and page-rates for photocopying.[10]

Yet more fundamentally, the pretrial procedural orders did not identify a minimum level of detail in the documentation required to substantiate that a particular PSC-member cost was "necessary" to a PSC litigation task and "reasonable" in amount. Rather, the orders simply directed the PSC to keep "careful, contemporaneous, detailed records" and provide "proper verification" of its expenditures. Although *Grendel's Den* makes clear that an entity requesting reimbursement must document its *actual expenditures,* normally by itemized receipt, *see* 749 F.2d at 956–57, the more amorphous and subjective criteria for substantiating that a given expenditure was "necessary" and "reasonable" may not be so readily documented. For example, in some instances courts do not require ex-

acting documentation even for major cost reimbursements, such as overhead expenses incurred in connection with the PSC office, relying instead on their intimate knowledge of the litigation for determining whether entire categories of costs pass the reasonableness test; *viz.,* whether the nature of the expenditure strikes the court as clearly superfluous or its amount transcends the broad bounds of reasonableness in the circumstances.[11]

Furthermore, the early pretrial orders afforded both an obvious and ready opportunity for appellants, *inter alios,* to propose, with somewhat greater particularity at least, more definite contours for monitoring, testing, and verifying PSC compliance with the amorphous "necessariness" and "reasonableness" criteria laid down by the district court. As this litigation demonstrates all too well, the terms "detailed records" and "proper verification"—though perhaps perfectly adequate benchmarks in a smaller, non-MDL litigation—simply were not up to the task in this mass-tort MDL. *See MCL* § 20.223 ("The court should also inform counsel what rec-

(appellant bears brunt of failure to include pertinent material in record).

**10.** The M.C.L. § notes:
Rules and practices vary widely with respect to reimbursement of expenses incurred by lawyers in the course of the case out of a fee award. Charges for paralegals and law clerks at market rates and the fees of necessary experts are generally reimbursable. Secretarial assistance, on the other hand, is a normal part of overhead, but courts have differed over whether overtime is reimbursable. Similarly, rulings vary on such items as copy and printing costs, certain meals and travel, and fax, telephone, and delivery charges. The determination of these kinds of claims should not be left to costly and time—consuming adversary adjudication at the end of the litigation; ground rules on reimbursement should be established *at the outset.*
*MCL* § 24.215 (emphasis added).

**11.** The district courts differ quite sharply regarding the detail needed in cost-reimbursement submissions:
The defendants next object that the plaintiffs' attorneys have not documented their request for expenses with receipts. It is not necessary or desirable for federal courts to review receipts for every five dollar expenditure. Judges, being former practicing attorneys, are quite capable of determining the reasonable-

ness of expenses incurred during litigation. Neither is it necessary to itemize expenses in great detail. For example, it is sufficient that copying costs were submitted without listing how many pages of which documents were copied during the three years of litigation. Law firms generally do not keep such records and little would be served by requiring them except to make litigation more expensive. The amount of the expenses submitted is certainly reasonable given the length and complexity of this case.
*Duke v. Uniroyal Inc.,* 743 F.Supp. 1218, 1227 (E.D.N.C.1990), *aff'd,* 928 F.2d 1413 (4th Cir.), *cert. denied,* 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991). *See Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 383 (D.D.C.1983) ("It is not necessary for plaintiffs to explain the purpose of every photocopy that is produced and every expenditure that is made in connection with the litigation. For most out-of-pocket costs, it is enough for the plaintiffs to identify the expenses by category, with a general description of the types of charges included in each category. In the case of particularly large or unusual expenditures, some additional explanation of the purpose of the expense may be necessary, but it is not the norm."), *aff'd in pertinent part,* 746 F.2d 4, 30 (D.C.Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). *But cf., e.g., Starnes v. Hill,* 635 F.Supp. 1270, 1273 (W.D.N.C.1986) (requiring exquisite detail).

ords should be kept...."). For example, even though early pretrial orders forewarned that the litigation would be prolonged and that it would be impracticable for the PSC to submit *all* its underlying documentation directly to the district court for interim-approval review, the PSC, IRPAs, and plaintiffs nonetheless refrained from proposing any further definition of the required level of documentary particularity. Thus, these matters were left unattended until the end of the litigation *at their peril.*

Moreover, appellants exacerbated the documentary muddle from the start by opting to forego ongoing monitoring of the PSC documentation. Unlike less prolonged and complex litigation, wherein interim-cost reimbursement claims may be deferrable until the litigation nears completion, the hands-off approach taken by appellants is utterly impracticable in these large and enduring mass-tort proceedings.

Given the potential for serious, long-term overreaching by the PSC under the relaxed regime envisioned by these pretrial orders, we discern no sound justification for appellants' failure to propose *in 1987* that *one of their own number* be designated to conduct closer review of the underlying PSC-cost documentation on an ongoing basis.[12] *See* Francis Bacon, *Of Suspicion* ("There is nothing makes a man suspect much, more than to know little."). Alternatively, the IRPAs could have sought district court authorization to retain an auditor to monitor these interim-cost reports on an ongoing basis for "necessariness" and "reasonableness." Thus, appellants' failure even to attempt interim monitoring directly contributed to the serious and otherwise avoidable consequences ulti-mately brought to the district court's attention at a time when corrective action could no longer be considered practicable.

Nor are appellants absolved of their *primary responsibility for protecting their own interests* based on the mere fact that the pretrial orders did not explicitly direct interim monitoring. Rather, the record is clear that appellants were neither precluded nor incapacitated from taking appropriate and timely precautions. First and foremost, fundamental deficiencies in the interim PSC-cost submissions to the court, especially their lack of particularity, readily could have been addressed and corrected *ab initio*, rather than at the end of the litigation. Second, appellants placed too much reliance upon *non*-MDL case authority, *see, e.g., Grendel's Den, supra*, in failing to conduct interim monitoring, based on their ill-advised assumption that the PSC's ultimate burden of proving its entitlement to reimbursement *relieved appellants of their independent responsibility* to collaborate with the district court and other parties to develop and monitor appropriate cost-containment procedures.

Appellants were well aware, throughout the proceedings, that the PSC had not been directed to submit its voluminous cost documentation to the district court together with the interim summaries. Thus, appellants knowingly failed to assume their rightful responsibilities for safeguarding their own interests by monitoring interim PSC-cost submissions as required to ensure that the evolving documentation practices actually utilized by the PSC were equal to the task and, if not, to broach the matter first with the PSC and, as need be, with the court, in

---

12. The PSC submitted its interim-cost claims under seal, presumably to preclude their perusal by "adverse" litigants (*i.e.,* the *defendants*). In some attorney fee and cost shifting disputes, the requesting party may not wish to disclose its documentation to a party-opponent during the litigation, out of fear that its litigation strategies may be divulged, even though the party-opponent eventually may be liable for the fees or costs. *See, e.g., Ring v. Commercial Union Ins. Co.,* 159 F.R.D. 653, 659–60 (M.D.N.C.1995) (party-opponent barred from obtaining fee statements in circumstances where it could "examine the bill to find out the nature of the services in order to discover what advice the attorney was providing defendants and to learn other details about defendants' investigation of her claim"); *Colonial Gas Co. v. Aetna Cas. & Sur. Co.,* 144 F.R.D. 600, 607–08 (D.Mass.1992) ("To the extent that time records and statements reveal the nature of the services provided, however, such documents are privileged.").

Of course, these IRPAs and plaintiffs were not opposing parties in the underlying litigation. Thus, there was no privacy impediment to allowing them access to the PSC's interim materials and supporting documentation simply on request. In fact, the appellees note that their cost documentation was always accessible to the IRPAs and plaintiffs on request.

time to permit effective preventive and corrective measures before matters became completely unmanageable.[13]

We underscore the central administrative necessity in mass-tort MDLs, that the PSC, IRPAs, and plaintiffs attempt very early on to work out mutually acceptable procedures for documenting and monitoring costs for which reimbursement is to be sought. No less importantly, both at the outset and thereafter, where cooperative efforts fail to produce agreement, or cost-benefit considerations independently warrant, judicial intervention should be promptly sought before matters worsen or become irremediable. *See Jaquette v. Black Hawk County, Iowa,* 710 F.2d 455, 463 (8th Cir.1983) ("[T]he key to avoiding excessive costs ... is *early* and stringent judicial management of the case.") (emphasis added).

The individual plaintiffs and IRPAs have enough at stake in these matters to prompt their early intervention. For example, if overly particularized PSC-cost documentation on "reasonableness" and "necessariness" were to be required without regard to sound cost-benefit considerations, its unnecessary procedural costs ultimately would be borne by the individual plaintiffs. *See Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 383 (D.D.C.1983) ("Indeed, the amount of time that would be required to document each item of expense in the detail apparently suggested by Defendant would be prohibitive; the compensable time required to generate the detail would exceed the expenses claimed."). Conversely, if appellants were to designate an IRPA, or retain an independent auditor, to monitor PSC-cost submissions, the expense conceivably could exceed whatever direct savings might be derived through any resulting cost-reimbursement disallowances. Thus, as the ultimate payors the individual plaintiffs and IRPAs have enough

at stake to warrant reasonable efforts at ensuring that adequate documentation and cost-monitoring procedures also make cost-benefit sense.

An adequate cost containment and monitoring system in a mass-tort litigation cannot be economically and efficiently designed and implemented from the outset absent a series of tradeoffs among the PSC, IRPAs, and plaintiffs, all of whom are under a mutual obligation to engage in an earnest effort to resolve their differences early on. These appellants, on the other hand, elected to acquiesce for four years in the flawed cost containment and monitoring system first set in place in 1987, awaiting an end to the principal litigation before coming forward with their objections. *See Reilly,* 863 F.2d at 160 (litigants share mutual burden to collaborate with district court in fashioning workable litigation procedures).

### 4. *Evidence of PSC Overreaching*

Next we consider whether the PSC-cost reimbursements should be subjected to the across-the-board cuts (25% to 33%) urged by appellants notwithstanding their own failure to take appropriate preventive or corrective action. In our view, their crude cuts ought not be imposed in these circumstances absent evidence that the PSC acted in bad faith or took unfair advantage of the procedural deficiencies. Not only have we found no such evidence, but we can discern no appreciable PSC overreaching from the record.

■ First, there should be no ready presumption that counsel appointed to the PSC expended its funds in bad faith; that is, with intent to inflate PSC-cost reimbursement submissions. This is especially true in the present circumstances, since the PSC members repeatedly attested that their cost submissions were bona fide. *See, e.g., Alabama*

---

**13.** For example, in 1993 Torres and Sterling were at loggerheads over whether the PSC cost-documentation records were adequate. Torres considered them an incomprehensible muddle. Sterling countered that the records were thoroughly organized at the outset but that Torres had "disorganized" them with his haphazard rummaging. The district court, after crediting Sterling's account, attempted to resolve the impasse by directing Torres and Sterling to *meet*

*and consult* at the JDD. By then, however, the damage had been done and the resultant administrative "chaos" alluded to by the district court made it impossible even to ascertain whether the PSC had maintained suitable documentation for the vast majority of its cost claims. With prudent ongoing monitoring by appellants from the outset, of course, the administrative confusion need never have gotten out of hand.

*Power Co. v. Gorsuch,* 672 F.2d 1, 5 (D.C.Cir. 1982) ("[I]n most cases, the court should be content to rely upon the integrity of counsel, and allow the[ ] expenses [claimed]."); *Greenspan v. Automobile Club of Mich.,* 536 F.Supp. 411, 413–14 (E.D.Mich.1982) (refusing to "second-guess" necessariness of costs and relying in part on affidavits filed by requesting parties and their attorneys); *cf. also, e.g., In re Agent Orange Prod. Liab. Litig.,* 611 F.Supp. at 1322 ("If there was doubt about the reason for a[n] [attorney's phone] call, it was allowed."); 28 U.S.C. § 1924 (permitting attorneys to vouch for necessariness of costs). Whether or not there is a direct or formal attorney-client relationship between plaintiffs and the PSC, the PSC and its IRPA members necessarily owed a fiduciary obligation to the plaintiffs. *Cf. In re Agent Orange Prod. Liab. Litig.,* 818 F.2d at 223 (noting that lead counsel owes fiduciary duty to class plaintiffs); *see also MCL* § 20.22 (counseling court to remind PSC members of "their responsibility to the court and their obligation to act fairly, efficiently, and economically in the interests of all parties and their counsel"). Furthermore, these PSC members simultaneously were acting in their respective roles as IRPAs, with direct professional responsibility for representing approximately seventy percent of the plaintiff class. In these circumstances especially, given their professional obligations to the court and their individual clients, we would be highly reluctant to suppose that the PSC members promoted overreaching by the PSC.

Second, the PSC "auditing" which did occur, whether or not adequate, cannot be dismissed as perfunctory, since it did screen out some significant cost excesses. For example, Adamina Soto attested that she contacted PSC members concerning problem expenses and followed up with requests for further documentation. Indeed, the Raben and Soto audits resulted in cost reductions exceeding $346,000. Although appellants object that

some PSC auditing was conducted at random, particularly that performed by Kevane and Soto, as it did not purport to verify each expense claim, the reviews conducted by Raben and Sterling were not random. Finally, even the random "audit" procedures were not conducted *under PSC control.* Thus, we are not persuaded that the random review procedures were flawed to the point that they could provide no effective deterrent to substantial PSC overreaching.

Third, appellants emphasize that Kevane and Raben were accountants, with little personal knowledge regarding the precise litigation tasks assigned to the PSC. Both were professional CPAs, however, and Raben in particular was no neophyte, having been responsible for comparable cost oversight in the MGM case, itself a hotel fire litigation. It does not seem unreasonable, therefore, absent evidence to the contrary, to expect that Raben was reasonably qualified for the professional task assigned to him.

Fourth, as there is no indication in the appellate record that the PSC ever attempted to prevent appellants from examining its underlying cost documentation prior to 1991, the reasonably foreseeable prospect that appellants might well (indeed should) have requested interim access to the documentation presumably had some deterrent effect upon PSC overreaching. Not only did the pretrial orders not preclude ongoing access by appellants to the PSC documentation, but there would appear to have been no conflict of interest or "work product" privilege which would have prevented the individual plaintiffs or IRPAs from inspecting the PSC documentation at any time during the litigation. *See supra* note 12.[14]

Finally, and most importantly, the district court initially proposed to limit PSC attorney fees and costs, *combined,* to ten percent of the eventual common fund, thus providing PSC members a substantial inducement to

---

**14.** Appellants point out that the PSC refused Torres access to certain "derivative" documents after 1991, such as the Raben work papers. Nevertheless, Torres had access to the raw materials examined by Raben (*viz.,* actual PSC receipts and other documentation). Moreover, appellants were not necessarily entitled to full-

fledged discovery, at least absent district court authorization. *See Thirteen Appeals,* 56 F.3d at 303 (noting that normally it is sufficient, for purposes of a fee and expense application, to order exchange of the "raw materials" or "all the data reasonably necessary to formulate ... objections") (citation omitted).

exert reasonable efforts to minimize PSC costs with a view to preserving a larger balance with which to fund their attorney fees as PSC members. *See In re Wells Fargo Securities Litigation,* 157 F.R.D. 467, 470 (N.D.Cal.1994) ("[A]n attorney generally has no incentive to minimize litigation expenses unless his fee award is inversely related to such expenses."). Appellants respond that the ten percent ceiling did not deter inflated costs, however, because the district court announced in January 1991 that it would not be enforced after all. *See Thirteen Appeals,* 56 F.3d at 307 n. 10 (holding that tentative cap was not binding on district court); *Nineteen Appeals,* 982 F.2d at 612 (same). Nevertheless, until January 1991, by which time the *lion's share* of its $10 million in costs had accrued, the PSC could not have known that the district court would discard the ten percent ceiling.

We therefore conclude, based on the foregoing considerations, particularly the absence of reliable evidence of overreaching or bad faith on the part of the PSC, that it would be inequitable to resort to the crude cost-cutting bludgeon proposed by appellants, who share at least equal responsibility for these procedural lapses. Although the procedural deficiencies discussed above may have led to some unnecessary or unreasonable expenditures, appellants clearly failed to alert the district court until it had become impracticable either to prevent or assess, let alone correct them in any reliable or cost-effective manner.

**15.** We see no need to catalog certain meritless challenges appellants raise to various miscellaneous expenses, especially in light of the deferential standard of review. *See* Order No. 584 (Aug. 29, 1995). We note simply that our review has disclosed no abuse of discretion in these regards.

**16.** Appellants likewise attack the district court determination that they waived objection to any PSC-office costs other than the Foulds fee. We need not resolve the issue, however, since appellants' objections to these cost-reimbursement claims are based on their contention that the PSC failed to meet its burden of proof and verification under *Grendel's Den,* a position which we have already rejected. *See supra* Section II.A; *see also In re Agent Orange Prod. Liab. Litig.,* 611 F.Supp. at 1331 (allowing "[a]ll reasonable, verifiable expenses for running" the PMC's centralized office).

## B. *Individualized Objections*

Next we consider appellants' objections to particular categories of cost-reimbursement claims.[15]

### 1. *PSC-Office Costs* [16]

■ Appellants contend that the $913,503 fee paid to Attorney Thomas H. Foulds by the PSC for services rendered as a putative "insurance expert" should not have been treated as a PSC-office cost, *see* Order No. 520 (Jan. 28, 1994), but as an attorney fee chargeable against the fifty percent share of the attorney-fee fund already recovered by PSC members. The district court determined that Foulds, who had worked for twenty years as an insurance claims manager before attending law school, had been hired not as an attorney, but primarily to consult with PSC attorneys regarding the nuts-and-bolts interpretation of various insurance policies. The PSC concedes that Foulds handled certain litigation tasks normally performed by attorneys (*e.g.,* depositions in the liability case against defendant Alexander and Alexander), but nonetheless insists that this was the most cost-efficient approach, especially given Foulds' intimate understanding of the pertinent insurance policies.[17] Although the parties cite no authority regarding the appropriate criteria for determining whether one in Foulds' position should be considered an insurance expert or an attorney, we are persuaded that the district court ruling constituted error in these particular circumstances.[18]

**17.** The PSC also protests that it came as no "surprise" to appellants that Foulds was retained. But this is beside the point. Appellants simply maintain that they were never informed that Foulds would be used as an "attorney."

**18.** The applicable standard of review is not clear and we find no controlling precedent. Nonetheless, the basic determination as to what work Foulds performed would call for fact-finding, reviewable only for clear error. *See Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1483 (1st Cir.1996). In this case, however, the parties agree as to what work Foulds performed. On the other hand, the determination as to which fund—attorney fee or cost—should bear the expense incurred for a particular type of service, would appear to be a legal question, or a mixed question in which the legal component predominates, either of which

■ As a general rule, a PSC member who serves simultaneously as an IRPA in a mass-tort MDL is entitled to recover separate compensation from the common fund for the legal services performed in *each* distinctive role. *See Thirteen Appeals,* 56 F.3d at 300 n. 2. The prospect of more lucrative returns for their services prompted many IRPAs to compete for these coveted PSC appointments in 1987, respectively urging upon the district court their particular experience and expertise in previous mass-tort suits. *See Nineteen Appeals,* 982 F.2d at 605 ("[A]ppointment to the PSC was much coveted. . . .").

■ On the other hand, all the unsuccessful IRPA candidates for PSC appointment must nevertheless contribute toward defraying PSC attorney fees/costs, since the district court's decision to establish a PSC diverts a significant portion of their respective contingent fees toward funding the PSC. *Cf. id.* at 310 (noting that though the PSC may be "a necessary concomitant to skillful case management of mass tort suits, it nevertheless significantly interferes with [the respective IRPAs'] expectations regarding the fees that his or her client has agreed to pay"). Accordingly, due regard should be had for these nonmember-IRPAs' diminished fee expectations, at least to the extent that "the judge . . . attempt to avoid any perception of favoritism" in mediating disputes between PSC members and nonmember IRPAs. *See Nineteen Appeals,* 982 F.2d at 605.

At the time the nine original PSC members were appointed, from among forty applicants, the district court expressly directed, *inter alia,* that the PSC "shall neither be enlarged nor diminished in size or membership without Court approval," Pretrial Order No. 127, at 29, that the PSC "conduct all pretrial liability and damage discovery," *id.* at 30, and that "only two members of the PSC, or counsel duly authorized by them, may question [ ] deponent[s]," *id.* Given the acknowledgement by the appellees that Foulds, on occasion, served as a *de facto* PSC attorney without prior district court authori-

zation, his retention, to that extent at least, directly contravened the explicit pretrial orders prohibiting any *de facto* expansion of PSC membership. Thus, the district court's subsequent authorization of reimbursement to the PSC for the Foulds fee as an insurance expert cannot cure the PSC's unauthorized, unilateral expansion of its attorney ranks, without inviting similar circumventions in the future.

We therefore reject the suggestion that we remand to permit the district court to apportion the $913,503 fee as between the "insurance expert" and "attorney" services performed by Foulds. We wish to make clear, however, that the PSC was not precluded from retaining Foulds based on a reasonable belief that he was the best qualified insurance expert available, simply because he happened to be an attorney. Nonetheless, once the PSC did retain Foulds, it owed nonmember IRPAs a duty of fair dealing to ensure that he undertook no unauthorized "attorney" tasks which might have been performed by some disappointed candidate for PSC membership.

### 2. *PSC-Member Costs*

#### a) *Photocopying Costs*

■ Appellants oppose the twenty-five-cent page rate at which the district court permitted reimbursement to PSC members for photocopying; in all, amounting to $184,-000. The district court explained that it "fail[ed] to see the difference between PSC members and any IRPA charging a client a reasonable amount for copying charges." Order No. 510–A, at 8 (Nov. 24, 1993). Appellants cite numerous decisions which hold the twenty-five-cent rate unreasonable, and argue that the PSC provided no proof that it actually incurred that cost to copy each page.

The PSC members offer three justifications for the approved rate. First, most photocopying was done at the PSC office and no reimbursement claim was made. Second, appellants knew early on in the litigation that the PSC had voted to permit its members to

---

normally would be reviewed *de novo.* As we are persuaded that the district court ruling cannot withstand review under either standard, we need

not determine the precise standard at this juncture.

claim reimbursement at twenty-five cents per page. Third, the twenty-five-cent rate, standard in many law offices, had been allowed in the MGM case. Although the district court's cost-allowance rulings are entitled to deferential review, *Grendel's Den*, 749 F.2d at 950, we are persuaded that its ruling does not withstand scrutiny.

[redacted] Unlike the PSC, the IRPAs are free to assess their own clients for photocopying in accordance with their respective contingent fee agreements and any applicable ethical-code provision. On the other hand, the PSC is a creature of the district court, whose mission is to promote more efficient litigation, *see MCL* § 20.223 ("Designated counsel should render services as economically as possible under the circumstances."). In a "common benefit" case of this sort, therefore, the court must ensure that PSC members recover only their *actual* costs, with no "profit" margin. *See Fogleman v. ARAMCO*, 920 F.2d 278, 286 (5th Cir.1991) ("To the extent that counsel charges a party more than actual cost for any service, be it reproduction of documents or telephone calls, counsel is recovering additional fees."); *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F.Supp. 1226, 1260 (N.D.Ill.1993); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 779 F.Supp. 1063, 1111–12 (D.Ariz.1990) (reducing in-house photocopying costs claimed at twenty or twenty-five cents: "[t]hat this amount may be charged to regular clients by the firm, or that it is 'standard' in the firm's area of practice, is not controlling, [and] Class members will not be assessed an amount that produces a clear and unwarranted profit for the firm"), *rev'd on other grounds*, 19 F.3d 1306 (9th Cir.1994).[19]

Unlike the PSC's alleged failure to document the "necessariness" and "reasonableness" of other types of expenses (*e.g.*, hotel charges, air fares), *see supra* Section II.A, its failure to document its own in-house photocopying costs presents a fundamental problem. As in-house photocopying costs are not incurred with "outside" providers (*e.g.*, hotel, airline, or even an outside photocopying service), there is no third-party receipt to verify the expenditure and its amount.[20]

Even if only by reasoned approximation, therefore, the PSC needed either to demonstrate the various components of its in-house photocopying costs (*e.g.*, the prorated cost of purchasing or leasing the photocopier, the copy paper, and salaries attributable to making the copies), or show the prevailing cost of comparable outside copy services, *see, e.g.*, *Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago*, 38 F.3d 1429, 1441 (7th Cir.1994) (holding that "charges for in-house reproduction may not exceed the charges of an outside print shop"). *See Grendel's Den*, 749 F.2d at 950 (noting that the district court's discretion "must, of course, be exercised within evidentiary bounds," and the court must "provide a 'clear explanation of its reasons for the fee award' ").

The PSC does not pretend to have established that it *actually incurred* a twenty-five-cent-per-page photocopying cost. As all three PSC justifications for the requested

19. *See also* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 379 (1993) (noting that counsel is "obliged to charge the client no more than the direct cost associated with the service (*i.e.*, the actual cost of making a copy on the photocopy machine) plus a reasonable allocation of overhead expenses directly associated with the provision of the service (*e.g.*, the salary of a photocopy machine operator)"); *id.* ("[I]t is impermissible for a lawyer to create an additional source of profit for the law firm beyond that which is contained in the provision of professional services themselves. The lawyer's stock in trade is the sale of legal services, not photocopy paper, tuna fish sandwiches, computer time or messenger services."); *cf. Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir.1973) (counsel in class actions "serve[] in something of a position of public trust ... [and] share[] with the court the burden of protecting the class action device against public apprehensions that it encourages ... excessive attorneys' fees").

20. *See In re Motor Freight Express*, 80 B.R. 44 (Bankr.E.D.Pa.1987) ("In the case of photocopying, counsel should inform the Court of the number of copies, the cost of each copy, and provide, if possible, a breakdown of the reasons why photocopying of certain documents was necessary."); *In re Old South Transp. Co.*, 134 B.R. 660, 667 (Bankr.M.D.Ala.1991) (same); *cf. Berryman v. Hofbauer*, 161 F.R.D. 341, 344 (E.D.Mich.1995) (noting that, under 28 U.S.C. § 1920, cost-reimbursement claimant's conclusory statement that copying costs were necessary is insufficient).

twenty-five-cent rate, *supra,* are inapposite to this essential showing, we vacate the district court ruling, and direct the PSC members to reimburse appellants for all PSC in-house photocopying cost claims calculated at a rate exceeding ten cents per page. Thus, appellees are to remit $110,400 of the $184,-000 disbursed to the PSC.

### b) *Hotel Rates*

▪▪▪ Lastly, appellants contend that the district court abused its discretion by allowing reimbursement to various PSC members for hotel-room charges ranging from $180 to $450 per day, notwithstanding its pretrial order cautioning that "hotel accommodations/meals should be moderate, not deluxe...." Pretrial Order No. 127, at 44–45. Appellants assert that any hotel-room charge above the $116 per diem rate then deemed deductible by the Internal Revenue Service, should not have been reimbursed, that less expensive rooms were available in Puerto Rico, and that on occasion PSC members obtained less expensive rates. There was no abuse of discretion.

First, the district court correctly noted that substantial leeway was due PSC members regarding their scheduling needs during the frenetic early stages of the litigation, when most investigation and discovery had to be conducted. *See* Order No. 584, at 9 (noting that the PSC conducted over 2300 depositions, and retained twenty-nine expert witnesses); *id.* ("[The investigative] stage was decisive in terms of immediately preserving evidence and conducting valuable investigations regarding the fire origin and spread. Time was of the essence and because of this, the activity was feverish, leaving scant opportunity to fine-tune the preparation and justification of expenses."). Consequently, the appropriate inquiry here is not simply whether an individual attorney might have booked a room at a lower rate during a given time period. Rather, the PSC frequently was required to coordinate lodging for many individuals and without much advance notice.

Thus, the appropriate inquiry must be whether the rate was reasonable in relation to the legitimate needs occasioned by the litigation tasks at hand. Against this backdrop, appellants have failed to demonstrate an abuse of discretion. None of the hotel rates strike us as facially abusive in these particular circumstances. *Cf. Grendel's Den,* 749 F.2d at 957 (finding abuse of discretion where hotel bill of $917 could be considered "unreasonable on its face").

Second, as with other PSC-costs, *see supra* Section II.A, appellants settled, from the outset and without protest, for amorphous general standards, such as "moderate" and non-"deluxe" hotel accommodations, whereas they were free from the start to *propose* the $116 per-diem rate they now suggest. Furthermore, there has been no showing that the hotel charges for which reimbursement was sought were either "deluxe" or not "moderate" *in the circumstances.*[21] Finally, as concerns appellants' contention that PSC members did not keep adequate supporting documentation relating to the "necessariness" and "reasonableness" of each hotel expense, their position is foreclosed. *See supra* Section II.A.

### III

### *CONCLUSION*

We acknowledge the rational force in appellants' contention that inherent conflicts of interest exist between the PSC and individual plaintiffs in mass-tort MDLs, yet serious deficiencies in the cost-submission procedures nevertheless persisted throughout this litigation. Nonetheless, despite reasonable notice of the obvious peril to their own financial interests, and their clear obligation to forfend against it from the outset, appellants did not turn serious attention to the PSC cost reimbursement regime deficiencies until the Gordian knot could no longer be undone. Consequently, we determine, as we must, that the requested relief has been rendered impracticable, through appellants' inaction, to the extent that further redress at this point

---

21. With respect to the $450 per diem rate, the district court supportably made the specific finding that the room in question was a suite, shared by several members and situated near facilities necessary to the litigation tasks to be performed.

would extend this satellite litigation for no cost-effective purpose. *See Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

Accordingly, within 30 days, appellees shall remit to the Clerk of the United States District Court for the District of Puerto Rico $1,023,903 (consisting of the $913,503 previously received as reimbursement for PSC costs incurred for services rendered by Mr. Foulds and the $110,400 for the PSC–Member photocopying costs), plus interest calculated at the legal rate (6% per annum), P.R. Laws Ann. tit. 31, § 3025, from the dates of the respective disbursements to the PSC from the litigation expense fund established in Pretrial Order No. 127. In due course, the Clerk of the United States District Court for the District of Puerto Rico shall distribute the remitted funds to those plaintiffs who prosecuted the instant appeal, in equal shares (or otherwise as the district court in its discretion may apportion). In turn, these plaintiffs shall pay their respective IRPAs whatever share of the rebated funds (if any) may be due the IRPAs under their respective contingent fee contracts for services rendered in prosecuting this appeal. In all other respects, the district court order is affirmed. The parties shall bear their own costs on appeal. *SO ORDERED.*